AO 106 (Rev. 06/09)  Application for a Search Warrant

**FILED**

# UNITED STATES DISTRICT COURT

### for the

### Northern District of Oklahoma

NOV 2 5 2019

Mark C. McCart, Clerk
U.S. DISTRICT COURT

| In the Matter of the Search of | |
|---|---|
| | ) |
| Samsung Smart Phone Model SM-5727VL; Samsung Smart Phone Serial No. R28J71TVYXE; Samsung Smart Phone Model SPH-0710; ZTE Smart Phone Model Z796C Serial No. 327B33332088; TracFone Smart Phone Model A462C TFPN GPALA462CB; and ALCATEL One Touch Smart Phone w/broken screen | ) ) ) ) ) ) ) |

Case No. 19-MJ-261-JFJ

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
                    See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___, there is now concealed *(identify the person or describe the property to be seized)*:

                    See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
   ☑ evidence of a crime;
   ☑ contraband, fruits of crime, or other items illegally possessed;
   ☑ property designed for use, intended for use, or used in committing a crime;
   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| **21 U.S.C. § 841(a)(1)** | **Possession With Intent to Distribute Methamphetamine** |

The application is based on these facts:

            **See Affidavit of William R. Mackenzie, TFO/DEA, attached hereto.**

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days _____ ) is requested
    under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Billy J. Stites, SA/BIA/DEATFO

Sworn to before me and signed in my presence.

Date: ___November 25th, 2019___

_____
*Judge's signature*

City and state: ___Tulsa, Oklahoma___

Jodi F. Jayne, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Billy J. Stites, having been duly sworn, do depose and state as follows:

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices described in Attachment A—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Indian Affairs, Division of Drug Enforcement and have been employed as such since November 2008. I am currently assigned to the United States Drug Enforcement Administration, Tulsa, Oklahoma Resident Office, as a Task Force Agent.  I was previously assigned to the Drug Enforcement Administration, Asheville, North Carolina Post of Duty.  I have been assigned to the Drug Enforcement Administration since April 2009.

3.      I have been in law enforcement since 2003.  I have completed the State of Oklahoma Council on Law Enforcement Education and Training reserve officer and basic police academy (CLEET). I have completed the Federal Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC) located in Glynco, Georgia.  During my employment in law enforcement, I have attended training in the areas of drug enforcement to include Dark Web Investigations, Electronic Device Investigations, Clandestine Lab Investigators Certification, Drug Identification, Criminal Interdiction, NARK II Drug test kit certification, Search and Seizure, Standardized Field Sobriety Testing, Covert Electronic Surveillance, Physical Surveillance, Electronic Surveillance, Diversion Investigations, Financial Investigations, Interstate Trafficking, Air and Ground Interdiction, Money Laundering Investigations and Title III wire investigations both

consensual and judicial. I have attended the United States Department of Interior Bureau of Indian Affairs Drug Investigators School, The United States Drug Enforcement Administration Drug Investigators School and The United States Drug Enforcement Administration Advanced Drug Investigators School. I attend at minimum forty hours annually of continuing education in drug enforcement related topics.

4.      During my employment in law enforcement, I have been involved in controlled substance investigations to include the manufacturing, trafficking, distribution, cultivation, possession of controlled substances and money laundering involving the proceeds from the distribution of controlled substances. I have participated in operations involving the surveillance, detection, identification, and seizure of controlled substances, utilizing confidential sources and undercover agents acting in an undercover capacity to purchase controlled substances. Your Affiant has obtained and served search warrants relating to controlled substance violations.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841(a)(1) have been committed by Maria Isabel GONZALEZ. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

7.      Based on my training, education, and experience, I have become familiar with the manner in which drug traffickers coordinate illegal activity, conduct illegal activity, and the communication methods used to conduct illegal activity. I have learned the following:

      a.  Drug distributors/traffickers commonly maintain books, records, receipts, notes, ledgers, and other documents/papers both electronically and in paper form, which

2

relate to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code and/or identify customers/sources/co-conspirators through monikers/nicknames. Documentation such as this oftentimes results because drug distributors/traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients and must account for these transactions in order to collect outstanding drug debts.

b.  Drug distributors/traffickers commonly maintain addresses or telephone numbers in notebooks, papers, cellular phones, computers, iPads, and electronic storage media which reflect names, address, and/or telephone numbers for their associates in the drug distribution/trafficking organization, even if said items may be in code, and such traffickers send and receive items listed in this affidavit by mail and other common carriers.

c.  Drug users, distributors and traffickers frequently take, or cause to be taken photographs or videotapes of themselves, their associates, their property/assets, and their product, and these individuals usually maintain these photographs or recordings/videos in the residences under their control. These photographs and videos are also often found in the individual's cellular telephone, computers, iPads, and other electronic storage media.

d.  I have participated in numerous searches of cellular telephones found to be in the possession of drug users/dealers/traffickers where text messages were discovered discussing topics such as quantities, prices and the quality of controlled dangerous substances, as well as dates, times and locations for drug transactions are discussed.  Usually, these communications are in coded drug talk/jargon and require review by peace officers experienced in deciphering such communications.

e.  In my experience in searching cellular telephones possessed by known drug users/distributors/traffickers, photos and/or videos have been discovered which evidence the use and distribution of controlled dangerous substances and the proceeds intended for or derived therefrom.  Commonly said evidence depicts pictures/videos of drugs for evidencing the respective drugs quality, condition, or quantity.  Moreover, users will commonly document episodes of drug use in social settings.  Additionally, drug distributors will take pictures ("trophy" pictures) or otherwise capture digital recordings for the purpose of memorializing their credibility/capability as a drug dealer and accomplishments (acquisition of assets/large amounts of U.S. currency) relating thereto.

f.  In all phases of drug distribution, the utilization of cellular telephones and other electronic devices is essential.  Drug users/dealers/traffickers use cellular telephones to place calls, as well as communicate by SMS text messaging.  As drug dealing necessarily entails constant communications with accomplices, co-

3

conspirators, clients, and sources, these communications virtually always take place by voice calls and text messaging over cellular telephones.

g.  Cellular telephones and other electronic devices are almost always used by drug distributors as a way to communicate. They will communicate by verbal conversations, digital text messaging, and/or sending photographs to one another. To avoid detection, drug distributors will often times speak in coded language or through use of vague messages. Sometimes the cellular telephone numbers they use are listed in different individuals' name or they will frequently change phone numbers. Drug distributors will often "drop" or switch cellular phones to avoid detection by law enforcement. This will result in the accumulation of several different cellular phones.

## BACKGROUND INFORMATION

8.     Cellular telephones and other electronic devices are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the commission of offenses.  I am aware that cellular telephones and other electronic devices have the capacity to store a vast amount of information, including but not limited to:  telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information.  This information may be contained on the actual device. This data and information is oftentimes also maintained by the various service providers on separate equipment.

9.     As such, Affiant is seeking court authority to search individual electronic devices described herein as well as court orders directing specific service providers to provide additional information and potentially stored wired and electronic information.  This affidavit is made in support of requests to the court for warrants and/or orders to inspect, review and retrieve various information including but not limited to cell tower information, records, stored wired and electronic communications, photographic images and other information more further described herein relating to electronic devices believed to have been used in the commission of various federal offenses.

4

10.     With regard to the cellular telephones referenced herein: the request for issuance of a search warrant is made for the seizure of physical evidence regarding federal criminal offenses, any and all information and or data stored in the referenced cellular telephones, to include but not be limited to: the telephone number of the referenced cellular telephones, direct connect push-to-talk number of the referenced cellular telephones, telephone numbers calling the referenced telephones, calls made, received and missed, telephone numbers called by the referenced telephones, address and phone books stored within the referenced cellular telephones, and any text messages sent, received, saved and found in the referenced telephones, voice mails made, received, and saved, calendars, stored photos and digital records, web site visits history, as well as all other stored electronic data and information. (See Attachments A and B).

11.     Service providers maintain additional information including electronic records that detail the "cell towers" or "cell sites" accessed by the aforementioned cellular telephones when the devices were used to receive calls, make calls, send text messages, etc.  This information will provide data and evidence of the physical movement of the devices and/or their users.

12.     Information contained in this Affidavit is based upon my personal knowledge and also from discussions I have had with other law enforcement officers who have investigated these offenses.

## CASE BACKGROUND

13.     Law enforcement has been investigating the distribution of methamphetamine by several individuals in the Commerce and Miami area of Northeast Oklahoma, within the Northern District of Oklahoma.  These individuals include Jorge Alberto MORENO, Maria I. GONZALEZ,

Reyna HERNANDEZ and others.  Based on the investigation to date, your affiant believes that GONZALEZ resides at 202 North Maple Street, Commerce, Oklahoma.

14.     Your Affiant went to 202 North Maple Street on August 28, 2019, and spoke with GONZALEZ.  When your affiant asked GONZALEZ on that date whether she lived at 202 North Maple Street, she admitted that she did.

15.     On March 21, 2019, your Affiant and other agents utilized a confidential informant ("CS1") to purchase approximately one ounce of crystal methamphetamine from MORENO.

16.     CS1, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with MORENO.  As confirmed by the audio and video recordings of the encounter, CS1 met with MORENO at 200 ½ North Maple Street.  CS1 negotiated with MORENO to purchase methamphetamine.  CS1 and MORENO stood in front of 200 ½ North Maple Street.  CS1 provided MORENO with $400 in pre-recorded currency and MORENO distributed a cigarette pack with a plastic bag containing a crystalline substance that was later laboratory-tested to be approximately 24 grams of methamphetamine.  MORENO remained at 200 ½ North Maple Street after CS1 left.

17.     On March 27, 2019, your Affiant and other agents utilized CS1 to arrange the purchase of approximately four ounces of crystal methamphetamine from MORENO.

18.     CS1, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with MORENO.  As confirmed by the audio and video recordings of the encounter, CS1 met with MORENO at 200 ½ North Maple Street.  CS1 arrived at 200 ½ before MORENO.  MORENO arrived at 200 ½ North Maple Street driving his 2008 Chevrolet Avalanche.  CS1 entered into the Avalanche with

6

MORENO. CS1 provided MORENO $1700 of pre-recorded currency, and MORENO distributed to CS1 two plastic bags containing a crystalline substance that was later laboratory-tested to be approximately 110 grams of methamphetamine. MORENO remained at 200 ½ North Maple Street after CS1 left.

19.   On April 22, 2019, your Affiant and other agents utilized CS1 to arrange the purchase of approximately four ounces of crystal methamphetamine from MORENO.

20.   CS1, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with MORENO. As confirmed by the audio and video recordings of the encounter, CS1 met with MORENO at the Dollar General store in Commerce, Ottawa County, Oklahoma at the request of MORENO. CS1 arrived before MORENO. As confirmed by agents' surveillance, MORENO left 200 ½ North Maple Street and arrived at the Dollar General in the 2008 Chevrolet Avalanche. As confirmed by the video and audio recordings, CS1 entered the Chevrolet Avalanche and rode with MORENO around several city blocks, including passing 200 ½ North Maple Street and 202 North Maple Street. Once inside the Chevrolet Avalanche, CS1 provided MORENO with $1700 of pre-recorded currency and MORENO distributed to CS1 a plastic bag containing a crystalline substance that was later laboratory-tested to be approximately 104 grams of methamphetamine.

21.   On August 5, 2019, your Affiant and other agents utilized a confidential informant ("CS2") to a purchase crystal methamphetamine from Maria GONZALEZ.

22.   CS2, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with GONZALEZ. CS2 met with GONZALEZ at 202 North Maple Street. CS2 negotiated with GONZALEZ to

purchase methamphetamine.  During the negotiation, GONZALEZ left 202 North Maple Street and walked to 200 ½ North Maple Street next door, presumably to meet with MORENO in an attempt to get the methamphetamine requested by CS2.  GONZALEZ returned without the methamphetamine, explaining that they would have to go somewhere else to get the methamphetamine.

23.    CS2, GONZALEZ and another unnamed individual drove near 417 F Street Southeast, Miami, Oklahoma.  GONZALEZ met with Reyna HERNANDEZ near 417 F Street Southeast, where your Affiant observed what appeared to be a hand to hand drug transaction between GONZALEZ and HERNANDEZ.  Once the hand to hand transaction was complete, GONZALEZ returned to the vehicle with CS2 and the other unnamed individual and left the area.  Your affiant confirmed through surveillance that HERNANDEZ then walked back inside 417 F Street Southeast.  As confirmed by the recordings of the encounter, while in the vehicle, CS2 gave $400 in pre-recorded currency to GONZALEZ, and in exchange, GONZALEZ gave CS2 a plastic bag containing a crystalline substance that was later laboratory-tested to be approximately 25 grams of methamphetamine.  After the transaction, GONZALEZ dropped off CS2, and, as confirmed by surveillance, traveled back to 202 North Maple Street at the completion of the transaction.

24.    On August 15, 2019, your Affiant and other agents utilized CS2 to attempt to purchase crystal methamphetamine from Maria GONZALEZ.

25.    CS2, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with GONZALEZ.  As confirmed by the video and audio recordings of the encounter, CS2 met with GONZALEZ at 202 North Maple Street, and CS2 negotiated with GONZALEZ to purchase methamphetamine.  In summary, GONZALEZ informed CS2 they would need to drive to another location to pick up the

8

methamphetamine.   CS2, GONZALEZ, and two other unnamed individuals drove to Reyna HERNANDEZ's residence at 417 F Street Southeast, Miami, Oklahoma.  While sitting in front of 417 F Street Southeast, GONZALEZ advised CS2 they would have to wait for the source of supply, to go on break from work.  Based on the location where the conversation took place, and based on my experience and training, I believe that HERNANDEZ was the anticipated source of supply to whom GONZALEZ was referring.  CS2 left GONZALEZ and the other individuals, without having obtained methamphetamine, while GONZALEZ and the other individuals drove back to 202 North Maple Street.

26.   On August 28, 2019, Detective David Wright with the Miami Police Department had obtained information that a juvenile reported missing and/or endangered was possibly staying at 202 North Maple Street.  Your affiant learned that the juvenile was in a relationship with GONZALEZ's son.  Your Affiant contacted Chief Ray Horn with the Commerce Police Department, who advised that his officers were aware of this information and had gone to the residence on several occasions and had spoken with GONZALEZ in an attempt to recover the missing juvenile.  Chief Horn reported that GONZALEZ would likely deny the juvenile was inside 202 North Maple Street.

27.   On the same date, your Affiant and other agents went to 202 North Maple Street and made contact with GONZALEZ, who allowed your Affiant to enter 202 North Maple Street.  Your Affiant informed GONZALEZ that agents suspected the missing juvenile was inside 202 North Maple Street, and it would not be a good idea to hide a missing juvenile.  GONZALEZ agreed to cooperate and walked into the rear of the residence, requesting your Affiant to stay by the front door.  GONZALEZ came out with the missing juvenile and turned the juvenile over to the Commerce and Miami Police Department.

9

28.     While entering 202 North Maple Street through the front entrance, your Affiant observed a surveillance camera sitting on the counter facing the front door. In my experience and training, drug traffickers often have surveillance equipment to allow them to monitor who is approaching the location where their drugs or drug proceeds are kept.

29.     On the same date, Detective David Wright interviewed the recovered missing juvenile, identified hereinafter as S.R. S.R. informed Detective Wright he/she had only arrived at 202 North Maple Street the day before. S.R. informed Detective Wright he/she had been using methamphetamine. S.R. alluded to using the methamphetamine inside 202 North Maple Street, but would not directly implicate GONZALEZ. Detective Wright believes S.R. is in a continued relationship with GONZALEZ's son and showed signs of loyalty toward GONZALEZ.

30.     On September 12, 2019, your Affiant and other agents utilized a confidential informant ("CS3") to purchase crystal methamphetamine from Maria GONZALEZ.

31.     CS3, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with GONZALEZ. As confirmed by audio and video recordings of the encounter, CS3 met with GONZALEZ at 202 North Maple Street, and CS3 negotiated with GONZALEZ to purchase methamphetamine. CS3 gave GONZALEZ $300 in pre-recorded currency and GONZALEZ distributed two plastic bags with suspected crystal methamphetamine. The substance was laboratory-tested to be approximately 13 grams of methamphetamine.

32.     On September 16, 2019, your Affiant and other agents utilized CS3 to purchase crystal methamphetamine from Maria GONZALEZ.

33.     CS3, under the direction and control of your Affiant and other agents, was outfitted

with an audio/video recording device and transmitter to document the meeting with GONZALEZ.

As confirmed by the audio and video recordings of the encounter, CS3 went to 202 North Maple

Street and encountered a person whom CS3 recognized as one of GONZALEZ's sons.

GONZALEZ's son informed CS3 that GONZALEZ was not at home.  GONZALEZ's son contacted

GONZALEZ by phone and, after speaking with GONZALEZ in what your affiant believes to be

Spanish, gave CS3 instructions in English to pick up GONZALEZ, near the Quapaw Casino on

South 580 Road in Miami Oklahoma.  The CS left 202 North Maple Street, and agents surveilled

CS3 as CS3 picked up GONZALEZ at the appointed location and traveled back with GONZALEZ to

202 North Maple Street.  CS3 negotiated with GONZALEZ to purchase methamphetamine. The

recordings then show GONZALEZ contacting a methamphetamine source of supply over the phone

to have methamphetamine delivered.  CS3 gave GONZALEZ $1000 in pre-recorded currency.

34.     A short time after GONZALEZ made the phone call, your Affiant observed

MORENO arrive at 200 ½ North Maple Street, exit his 2014 GMC SUV, leaving his driver's side

door open, and walk between 200 ½ North Maple Street and 202 North Maple Street.  At the same

time, GONZALEZ exited 202 North Maple Street out the back of the residence.  200 ½ North Maple

Street and 202 North Maple Street share a small walking path behind the houses where your Affiant

believes GONZALEZ and MORENO met out of sight of agents.  A short time after GONZALEZ

and MORENO both walked behind their houses, GONZALEZ re-entered 202 North Maple Street

and met with CS3, while MORENO re-entered his vehicle and left the area.  GONZALEZ then

distributed a plastic bag with suspected methamphetamine to CS3.  GONZALEZ remained at 202

North Maple Street after CS3 left. The substance laboratory-tested positive as approximately 55 grams of methamphetamine.

35.     Your Affiant believes GONAZALES utilizes 202 North Maple Street as a residence and base of operation to run her methamphetamine distribution business, and that MORENO, GONZALEZ, HERNANDEZ, and other individuals are conspiring to traffic in and distribute crystal methamphetamine within the Northern District of Oklahoma.

36.     CS1 has worked intermittently with the BIA, DEA and Oklahoma Bureau of Narcotics since 2019. The CS has a criminal history of child support violations, vehicle theft, stolen property, assault, drug/firearm possession and drug distribution. The CS has provided information, which has been independently corroborated when possible. The CS has assisted the agencies, which have led to the seizure of methamphetamine. While working on investigations with your Affiant, the CS has not provided information that has been deemed false or misleading. Currently, the CS is working for monetary compensation.

37.     CS2 has worked with the BIA and DEA since 2019. The CS has a criminal history of drug possession, grand larceny, uttering forged instrument, stolen vehicle, driving under the influence, and embezzlement. The CS has provided information that has been independently corroborated when possible. The CS has assisted law enforcement, which has led to the seizure of methamphetamine and stolen vehicles, arrest of fugitives and seizure of methamphetamine. While working on investigations with your Affiant, the CS has not provided information that has been deemed false or misleading. Currently, the CS is working for monetary compensation.

38.     CS3 has worked intermittently with the BIA and DEA since 2016. The CS has a criminal of obtaining merchandise by means of bogus check, violation of compulsory education act

12

and aiding/abetting minor in need of supervision. The CS has provided information that has been independently corroborated when possible. The CS has assisted law enforcement, which has led to the seizure of methamphetamine and conviction of multiple defendants. While working on investigations with your Affiant, the CS has not provided information that has been deemed false or misleading. Currently, the CS is working for monetary compensation.

39.     Your Affiant knows that methamphetamine is a schedule II controlled substance.

40.     On September 20, 2019, your Affiant requested from United States Magistrate Judge Jodi F. Jayne search warrants for 200 ½ North Maple Street and 202 North Maple Street in Commerce Oklahoma. Magistrate Judge Jayne issued the search warrants on the same date.

41.     On September 26, 2019, your Affiant and other agents executed the search warrant at 202 North Maple Street. During the search of that location, officers located various articles indicative of drug use and/or distribution, including a digital scale, a mirror lying flat on a dining room table, multiple smoking pipes, and a surveillance-style video camera.

42.     Based in part on the conduct described above, your affiant knows that on October 16, 2019, a federal grand jury indicted MORENO and GONZALEZ on charges of methamphetamine trafficking conspiracy and distribution of methamphetamine, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), respectively.

## CELLULAR TELEPHONES & ELECTRONIC DEVICES

43.     During a search of 202 North Maple Street, Commerce, Oklahoma, six (6) cellular phones were found within the residence. The aforementioned cellular phones are currently in the custody of the Drug Enforcement Administration Tulsa Resident Office, in the Northern District of Oklahoma. The cellular phones are identified as:

13

1)   Samsung smart phone Model SM-5727VL Galaxy J7 Sky Pro;

2)   Samsung smart phone serial number R28J71TVYXE with no back or battery;

3)   Samsung smart phone Model SPH-0710 with no back or battery;

4)   ZTE smart phone Model Z796C serial number 327B33332088 with no back or battery;

5)   TracFone smart phone Model A462C TFPN GPALA462CB; and

6)   ALCATEL One Touch smart phone with broken screen.

44.   The applied-for warrant would authorize the forensic examination of the aforementioned devices for the purpose of identifying electronically stored data particularly described in Attachment B.

45.   Based on the above information, Affiant states there is probable cause to believe that the phones described herein were used to communicate during and after and to facilitate the commission of drug trafficking activity, in violation of Title 21, United States Code, Section 846 (Conspiracy) and Title 21, United States Code, Section 841(a)(1) (Possession with intent to distribute and distribution of methamphetamine).   Affiant therefore respectfully requests a warrant and/or the appropriate Orders be issued for the search of the cellular phones and phone records associated with the above-referenced phones.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

46.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.   Similarly, things that have been viewed via the Internet

14

are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

47.     There is probable cause to believe that things that were once stored on the device may still be stored there, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer and smartphone files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a smartphone or other electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, the smartphone may retain a log or record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, electronic storage media may contain electronic evidence of how a device has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Device users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

48.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were

15

used, the purpose of their use, who used them, and when.  There is probable cause to believe that this

forensic electronic evidence might be on the devices because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Device file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium is a dynamic process.  Whether data stored on a device is evidence may depend on other information stored on the computer and the application of knowledge about how a device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is, or is not, present on a storage medium.

f.     I know that when an individual uses an electronic device as a communication device or a device to obtain information from the Internet related to a criminal act, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.

16

From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

49.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

50.     *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Respectfully submitted,

_____

Billy J. Stites
BIA Special Agent
DEA Task Force Agent

Subscribed and sworn to before me on November 25th, 2019.

_____

JODI F. JAYNE
United States Magistrate Judge

17

# ATTACHMENT A

The property to be searched consists of six (6) cellular phones:

1)  Samsung smart phone Model SM-5727VL Galaxy J7 Sky Pro;

2)  Samsung smart phone serial number R28J71TVYXE with no back or battery;

3)  Samsung smart phone Model SPH-0710 with no back or battery;

4)  ZTE smart phone Model Z796C serial number 327B33332088 with no back or battery;

5)  TracFone smart phone Model A462C TFPN GPALA462CB; and

6)  ALCATEL One Touch smart phone with broken screen.

The devices are currently in the custody of the Drug Enforcement Administration Tulsa Resident Office, in the Northern District of Oklahoma.

The warrant authorizes the forensic examination of the devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the Devices described in Attachment A that relate to unlawful drug distribution and drug conspiracy activities in violation of Title 21, United States Code, Sections 841 and 846.

a.      records relating to communication with others as to the criminal offenses above; including incoming and outgoing voice messages; text messages; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from, Facebook messenger, Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

b.      records relating to documentation or memorialization of the criminal offenses above, including voice memos, photographs, videos, and other audio and video media, and all ExIF information and metadata attached thereto including device information, geotagging information, and information of the relevant dates related to the media;

c.      records relating to the planning and execution of the criminal offenses above, including Internet activity, including firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

d.      application data relating to the criminal offenses above;

e.      lists of customers and related identifying information;

f.      types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

g.      any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information); and

h.      all bank records, checks, credit card bills, account information, and other financial records.

2.    Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.    All records and information related the geolocation of the Devices at a specific point in time;

4.    All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the statutes listed in Paragraph 1 of this Attachment.

5.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.